IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 14-cv-02660-MEH

MICHAEL MAST,

      Plaintiff,

v.

CAROLYN COLVIN, Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

**Michael E. Hegarty, United States Magistrate Judge**.

    Plaintiff Michael Mast appeals from the Social Security Administration ("SSA") Commissioner's final decision denying his application for disability and disability insurance benefits ("DIB"), filed pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401-433, and his application for supplemental security income benefits ("SSI"), filed pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383c.   Jurisdiction is proper under 42 U.S.C. § 405(g). The parties have not requested oral argument, and the Court finds it would not materially assist the Court in its determination of this appeal.   After consideration of the parties' briefs and the administrative record, the Court **affirms in part and reverses in part** the ALJ's decision and **remands** the Commissioner's final order.

## BACKGROUND

### I.      Procedural History

Plaintiff seeks judicial review of the Commissioner's decision denying his applications for

DIB and SSI benefits filed on February 17, 2011.  [AR 209-224]  After the applications were

initially denied on July 19, 2011 [AR 110-125], an Administrative Law Judge ("ALJ") scheduled

a hearing upon the Plaintiff's request for September 27, 2012 [AR 177-208].  Plaintiff and a

vocational expert testified at the hearing. [AR 42-78] The ALJ issued a written ruling on November

14, 2012 finding Plaintiff was not disabled since August 1, 2009, because considering Plaintiff's

age, education, work experience and residual functional capacity, there were jobs existing in

significant numbers in the national economy that Plaintiff could perform.  [AR 14-31]  The SSA

Appeals Council subsequently denied Plaintiff's administrative request for review of the ALJ's

determination, making the SSA Commissioner's denial final for the purpose of judicial review [AR

4-9].  *See* 20 C.F.R. § 416.1481.  Plaintiff timely filed his complaint with this Court seeking review

of the Commissioner's final decision.

### II.     Plaintiff's Alleged Conditions

Plaintiff was born on April 24, 1979; he was 31 years old when he filed his application for

DIB and SSI benefits on February 17, 2011.  [AR 209-224]  Plaintiff claims he became disabled on

August 1, 2009 [AR 45] and reported that he was limited in his ability to work by "PTSD, Bipolar,

antisocial behavior."  [AR 287]

A Mental Health record dated July 28, 2009 from the Colorado Department of Corrections

reflects a "clinical note" from Patricia Warren for the Plaintiff listing as "Problem[s]": "anger issues;

hx of substance abuse; social isolation; does not have GED; assaultive demeanor." [AR 415] Ms. Warren diagnosed Plaintiff with bipolar disorder, nos, polysubstance dependence, and personality disorder, nos [*id.*], and was prescribed Bactrim DS, Docusate, and Trazodone as of August 11, 2009 [AR 419]

The next record is dated February 16, 2011 from the Arapahoe/Douglas Mental Health Network ("ADMHN") reflecting Plaintiff's initial intake and request for services related to "his bipolar issues ... sleep disturbances as well as ... anger." [AR 433] The record notes that Plaintiff was currently on parole "and they are requiring a mental health evaluation to determine possible mental health issues and/or treatment recommendations." [AR 424] Cynthia Jackson, NP reported Plaintiff's "admitting diagnosis" on March 2, 2011 as "mood disorder, nos, polysubstance dependence (remission), and antisocial personality disorder" and assessed a Global Assessment of Functioning (GAF) score of 41.[1]   [AR 427-428; 435] In so finding, Nurse Jackson noted that

---

[1]In *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162 n.1 (10th Cir. 2012), the Tenth Circuit describes the GAF as follows:
The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. *See* American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32, 34 (Text Revision 4th ed. 2000). GAF scores are situated along the following "hypothetical continuum of mental health [and] illness":
• 91–100: "Superior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms."
• 81–90: "Absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."
• 71–80: "If symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)."
• 61–70: "Some mild symptoms (e.g., depressed mood and mild insomnia), OR some difficulty

Plaintiff's first question of the day was for the execution of a Med-9 form, then he reported he suffered from "severe anxiety, depression and insomnia," had two previous suicide attempts, had a history of child abuse by father, domestic violence, felony menacing, substance dependence and incarceration, and a family history of various mental illnesses. [AR 429-431] Nurse Jackson concluded Plaintiff "is difficult to interview and diagnose, primarily related to his irritability, antisocial traits, the fact that he is [a] poor and inconsistent historian, and his agenda (rule out malingering related to controlled substances and Med-9)." [AR 431] That same day, Nurse Jackson completed (and co-signed by an "MD" whose name is illegible) a "Medical Source Statement

---

in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."
• 51–60: "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."
• 41–50: "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."
• 31–40: "Some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child beats up younger children, is defiant at home, and is failing at school)."
• 21–30: "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)."
• 11–20: "Some danger of hurting self or others (e.g., suicide attempts without clear expectation of death; frequently violent; manic excitement) OR occasionally fails to maintain minimal personal hygiene (e.g., smears feces) OR gross impairment in communication (e.g., largely incoherent or mute)."
• 1–10: "Persistent danger of severely hurting self or others (e.g., recurrent violence) OR persistent inability to maintain minimal personal hygiene OR serious suicidal act with clear expectation of death."
• 0: "Inadequate information."

Concerning the Nature and Severity of Mental Impairment" for Robert K. Gruber, Esq. [AR 435-438]

Plaintiff then engaged in 11 therapy sessions at ADMHN with Lucy DeMuth from March 15, 2011 through September 2, 2011. [AR 480-514] At the last appointment, Plaintiff reported feeling more stable on his medication regimen, feeling more hopeful, planning to enroll in school, and avoiding drugs and alcohol. [AR 485] He then called the facility on October 17, 2011 to inform Ms. DeMuth he would be seeking inpatient treatment for his substance abuse and moving to Pueblo. [AR 483]

Meanwhile, Plaintiff presented to Frank J. Wright, M.D. on May 4, 2011 for a consultative physical examination, at which the Plaintiff reported that "all of his allegations are psychological," including "anxiety and anger issues," and "denied any physical problems." [AR 439] Plaintiff also told Dr. Wright that he can care for his personal hygiene, wash dishes, go to the grocery store and visit with family and friends, but cannot cook ("does not know how") and does not drive. [*Id.*] After a full examination, Dr. Wright found Plaintiff had no physical limitations for an 8-hour work day, but his recommendation was to "await the psychological evaluation." [AR 440-442]

Plaintiff presented to Michelle Warfield, Ph.D. for a consultative mental health examination on May 16, 2011. [AR 446-451] Dr. Warfield noted at the outset her concern that Plaintiff "did not put forth full effort in the examination." [AR 446] Plaintiff reported to Dr. Warfield that he had suffered personality disorder, antisocial disorder, post-traumatic stress disorder and "paranoid suffering" since 1996; had been in therapy at ADMHN since 2008; had been a psychiatric inpatient six times, including during his childhood; was abused by his father as a child; had a family history

of mental illness (which Dr. Warfiled noted as "questionable"); re-stated the same daily living activities he reported to Dr. Wright; was "adamant in denying that he has ever used alcohol or any substances"; was incarcerated for assaults and violent behavior; felt hopeless, helpless and worthless and suffered disturbed sleep; had previously seen "shadow people" and heard voices "of a command nature to harm himself or others." [AR 447-450]  Dr. Warfield reviewed Plaintiff's medical records, performed a "detailed mental status examination" and diagnosed Plaintiff with anxiety disorder, nos, history of polysubstance dependence, and "likely" antisocial personality disorder, and a GAF score of 58. [AR 450] Dr. Warfiled concluded that Plaintiff's history "makes it highly unlikely that he would get along with coworkers and supervisors," but could follow one-step instructions so long as his rage and assault potential did not interfere. [AR 450-451]

The next record from May 18, 2012 reflects that Plaintiff presented to a clinic in Pueblo for an initial assessment [AR 463], at which Plaintiff reported to Lois Sandland, LCSW, he had been diagnosed with antisocial personality disorder, depression and PTSD in the past and "often thinks about killing people if people look at him wrong." [AR 463-469] Plaintiff met with Ms. Sandland again for individual therapy once in July 2012 and once in August 2012. [AR 470-472] At the August 7, 2012 session, Ms. Sandland noted Plaintiff's comments:

> I know I missed the first appointment with you. How long will this appointment take? I thought you would just read my old records from Arapaho [sic] Mental Health Center and you would sign my AND form for benefits. You also have a form to complete for my disability attorney regarding my past work history. I think it's better if you can just read my old records from my former psychiatrist instead of me going over my whole history.

[AR 473-474] However, after reviewing Plaintiff's history and reports, Ms. Sandland assessed

6

Plaintiff with post-traumatic stress disorder, an unspecified mood disorder, antisocial personality disorder, and a GAF score of 50. [AR 475-478]

## III.   Hearing Testimony

At the hearing on September 27, 2012, the Plaintiff, his counsel, and vocational expert Caroline Hoiseth appeared.  [AR 42-78]  Plaintiff's counsel opened by amending Plaintiff's disability onset date to August 1, 2009. [AR 45]  The Plaintiff then testified that he was currently working 20 hours per week cleaning bathrooms at Pueblo Community College; he had had some "slight" verbal altercations with co-workers; he had been fired from jobs after angry outbursts and panic attacks; felt anxious when driving; he was able to care for himself; he went to the grocery store on "good" days, but did not visit people or places, had no hobbies, did not read or watch television, did not cook, clean or do laundry; he recently finished probation; he was on four medications that made him drowsy; he was seeing a therapist and psychologist at Spanish Peaks, who diagnosed him with PTSD, antisocial disorder, social anxiety, and paranoid personality disorder, and who would call him three days in advance of sessions so he did not miss one; he experienced periods of nightmares and flashbacks; he typically approached public places when he believed the fewest people would be there; he experienced severe anxiety when given multiple tasks at work; and out of every three or four "passive" days, he would experience one or two "edgy" days. [AR 46-69]

Ms. Hoiseth testified that an individual with Plaintiff's age, experience and education – who can perform unskilled, routine and repetitive work and who can have no interaction with the public and occasional interaction with coworkers – could perform the jobs of institutional cleaner, industrial cleaner, and housekeeper, with an absentee rate of one day per month and 15% off task.

[AR 70-73]   She also testified that these jobs did not involve working directly with another individual, consisted of one- or two-step instructions, and required little supervision after about a month of training.   [AR 74-76]

The ALJ issued an unfavorable decision on November 14, 2012.   [AR 14-35]

## LEGAL STANDARDS

### I.      SSA's Five-Step Process for Determining Disability

Here, the Court will review the ALJ's application of the five-step sequential evaluation process used to determine whether an adult claimant is "disabled" under Title II and Title XVI of the Social Security Act, which is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 1382c(a)(3)(B); *see also Bowen v. Yuckert*, 482 U.S. 137, 140 (1987).

Step One determines whether the claimant is presently engaged in substantial gainful activity.   If he is, disability benefits are denied.   *See* 20 C.F.R. §§ 404.1520, 416.920.   Step Two is a determination of whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. §§ 404.1520(c), 416.920(c).   If the claimant is unable to show that his impairment(s) would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits.   *See* 20 C.F.R. 404.1520(c).   Step Three determines whether the impairment is equivalent to one of a number of listed impairments deemed to be so severe as to preclude substantial gainful employment.   *See* 20 C.F.R. §§ 404.1520(d),

416.920(d).  If the impairment is not listed, he is not presumed to be conclusively disabled.  Step

Four then requires the claimant to show that his impairment(s) and assessed residual functional

capacity ("RFC") prevent him from performing work that he has performed in the past.  If the

claimant is able to perform his previous work, the claimant is not disabled.  *See* 20 C.F.R. §§

404.1520(e), (f), 416.920(e) & (f).  Finally, if the claimant establishes a *prima facie* case of

disability based on the four steps as discussed, the analysis proceeds to Step Five where the SSA

Commissioner has the burden to demonstrate that the claimant has the RFC to perform other work

in the national economy in view of his age, education and work experience.  *See* 20 C.F.R. §§

404.1520(g), 416.920(g).

## II.    Standard of Review

This Court's review is limited to whether the final decision is supported by substantial

evidence in the record as a whole and whether the correct legal standards were applied.  *See*

*Williamson v. Barnhart*, 350 F.3d 1097, 1098 (10th Cir. 2003); *see also White v. Barnhart*, 287 F.3d

903, 905 (10th Cir. 2001).  Thus, the function of the Court's review is "to determine whether the

findings of fact ... are based upon substantial evidence and inferences reasonably drawn therefrom.

If they are so supported, they are conclusive upon the reviewing court and may not be disturbed."

*Trujillo v. Richardson*, 429 F.2d 1149, 1150 (10th Cir. 1970); *see also Bradley v. Califano*, 573 F.2d

28, 31 (10th Cir. 1978).  "Substantial evidence is more than a scintilla, but less than a

preponderance; it is such evidence that a reasonable mind might accept to support the conclusion."

*Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir. 1987) (citing *Richardson v. Perales*, 402 U.S.

389, 401 (1971)).  The Court may not re-weigh the evidence nor substitute its judgment for that of

the ALJ.  *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (citing *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).   However, reversal may be appropriate when the ALJ either applies an incorrect legal standard or fails to demonstrate reliance on the correct legal standards.  *See Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## ALJ's RULING

The ALJ ruled that Plaintiff had not engaged in substantial gainful activity since the amended onset date of his disability, August 1, 2009, although he was working part-time at the time of the hearing; he had since left his job due to "verbal fights with people" (Step One).  [AR 19-20]  Further, the ALJ determined that Plaintiff had the following severe impairments: bipolar disorder/mood disorder and personality disorder (Step Two).  [AR 20]  Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment deemed to be so severe as to preclude substantial gainful employment (Step Three).  [AR 20-]

The ALJ then determined that Plaintiff had the RFC to perform "a full range of work at all exertional levels, but with the following non-exertional limitations: the claimant is limited to unskilled, routine and repetitive jobs, with no public interaction, only occasional coworker interaction, and that do not involve tandem tasks."  [AR 22]  The ALJ determined that the record reflects Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements that his impairments result in disabling symptoms and limitations are not credible." [AR 18]

The ALJ went on to determine that Plaintiff had no past relevant work (Step Four), and that

considering Plaintiff's age, education, work experience and residual functional capacity, Plaintiff could perform the jobs existing in significant numbers in the national economy (Step 5). [AR 30] As a result, the ALJ concluded that Plaintiff was not disabled at Step Five of the sequential process and, therefore, was not under a disability as defined by the SSA. [AR 30-31]

Plaintiff sought review of the ALJ's decision by the Appeals Council on December 26, 2012. [AR 10] On April 23, 2014, the Appeals Council notified Plaintiff that it had determined it had "no reason" under the rules to review the decision and, thus, the ALJ's decision "is the final decision of the Commissioner of Social Security." [AR 4-6] After receiving an extension of time within which to do so, Plaintiff timely filed his Complaint in this matter on September 26, 2014.

## ISSUES ON APPEAL

On appeal, Plaintiff alleges the following errors: (1) the ALJ failed to state the amount of weight given to Dr. Warfield's opinions; (2) the ALJ did not state valid reasons for giving great weight to Dr. Ryan's opinions; (3) the ALJ did not follow Dr. Ryan's limitations despite giving her opinion great weight; (4) the ALJ based some of her mental limitations on "unweighed" evidence; and (5) the ALJ did not properly evaluate Ms. Jackson's opinions of mental limitations.

## ANALYSIS

The Court will address each of Plaintiff's issues in turn.

## I.      Whether the ALJ Erred by Failing to State the Weight Given Dr. Warfield's Opinion

Plaintiff contends that the ALJ failed to state the "amount of weight" given the opinion of the consultative psychologist, Dr. Warfield. [*See* AR 446-451] Defendant counters that any error in identifying the weight given was harmless since the ALJ thoroughly discussed the opinion and

why certain portions were accepted and rejected. [Response, docket #15 at 17-18.] Plaintiff replies that the ALJ failed to explain why her RFC finding is consistent with Dr. Warfield's opinion. [Reply, docket #16 at 7-8.]

"An ALJ must evaluate every medical opinion in the record." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing former 20 C.F.R. § 404.1527(d)); *see also* 20 C.F.R. § 416.927(c). Furthermore, the social security regulations state that, unless the treating source opinion is given controlling weight (which did not occur here), the ALJ "must" explain in the decision the weight given to the opinions of state agency medical or psychological consultants. 20 C.F.R. § 404.1527(e)(2)(ii). The social security rulings require that an ALJ "may not ignore [the opinions of psychological consultants,] and must explain the weight given to these opinions in their decisions." SSR 96-6P, 1996 WL 374180, at *1 (July 2, 1996).

Here, the Court disagrees with Plaintiff and finds the ALJ afforded Dr. Warfield's opinion "great" weight. That is, after discussing each of Dr. Warfield's and Dr. Ryan's (reviewing physician) opinions, the ALJ states, "the undersigned assigns great weight to these opinions ...." [AR 28]

The Plaintiff then argues in his reply brief that the ALJ failed to articulate *why* Dr. Warfield's opinion deserved great weight and, thus, the decision is confusing. [Docket #16 at 7-8.] Again, the Court disagrees. *See Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (an ALJ must "give good reasons in the notice of determination or decision fo rthe weight he ultimately assigns the opinion"). The ALJ describes in detail both Plaintiff's reports to Dr. Warfield and Dr. Warfield's objective findings concluding they were consistent with the RFC. [*Id.*] The ALJ also noted Dr.

12

Warfield's concern that Plaintiff's "rage and assault potential could take precedence over his following through with instructions," and found based on the record that, *after* Dr. Warfield's assessment, the record reflects Plaintiff was "working on his anger and irritability, interacting more appropriately with others, and succeeded in earning his GED" and, thus, discounted this portion of Dr. Warfield's opinion. [*Id.*]

In sum, the Court finds the ALJ applied the correct legal standards in weighing Dr. Warfield's opinion.

## II. Whether the ALJ Erred in Stating Invalid Reasons for Assigning Great Weight to Dr. Ryan's Opinion

After evaluating Dr. Warfield's opinion, the ALJ stated the following with respect to Dr. Ryan's opinion:

> The undersigned also considered the other opinion evidence of record in determining the claimant's residual functional capacity assessment. A state agency psychological consultant [Dr. Ryan] reviewed the evidence of record and opined that the claimant can follow simple instructions, sustain ordinary routines, and make simple work related decisions (Exhibits 3A & 4A). In addition, the claimant cannot work closely with supervisors or coworkers, but can accept supervision if the contact is not frequent or prolonged, and requires less interaction with coworkers and the public. The undersigned assigns great weight to these opinions, as they are supported by substantial medical evidence of record and consistent with this decision's residual functional capacity assessment.

[AR 28] An "ALJ must make clear how much weight the opinion is being given (including whether it is being rejected outright) and give good reasons, tied to the factors specified in the cited regulations for this particular purpose, for the weight assigned." *Krauser*, 638 F.3d at 1330.

Plaintiff contends that the ALJ's decision is improper in that it can be inferred as first developing the RFC, then comparing the RFC to the record medical opinions. The Court rejects this

argument as unsupported and speculative.  The ALJ accurately described Dr. Ryan's opinion then noted it was consistent with the RFC; certainly, as read, the ALJ's decision demonstrates she applied the correct legal standard.  *See Chapo v. Astrue*, 682 F.3d 1285, 1289 (10th Cir. 2012).

Plaintiff also argues the decision improperly concludes Dr. Ryan's opinion is "supported by substantial medical evidence of record" without further specifying which evidence supports the opinion.  Taken out of context, the Court may agree; however, the Plaintiff fails to acknowledge that prior to coming to this conclusion, the ALJ described the record (including medical reports and Plaintiff's testimony) in substantial detail in six-and-one-half single-spaced pages.  This Court, and any reviewing court, would have no trouble reviewing the decision to determine the propriety of the ALJ's conclusion.  *See Branum v. Barnhart*, 385 F.3d 1268, 1270, 105 F. App'x 990 (10th Cir. 2004) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)) (on appeal, a reviewing court's job is neither to "reweigh the evidence nor substitute our judgment for that of the agency.").

## III.    Whether the ALJ Erred by Failing to Incorporate Dr. Ryan's Limitations into RFC

After determining Plaintiff would have moderate limitations in carrying out detailed instructions, maintaining attention and concentration for extended periods, working in coordination with or in proximity to others, interacting appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, and getting along with coworkers and peers without exhibiting behavioral extremes, Dr. Ryan concluded on July 1, 2011 "cl[aiman]t can follow simple instructions, sustain ordinary routines and make simple work[-]related decisions; cannot work closely with supervisors or coworkers; can accept supervision if contact is not frequent or

prolonged, less interaction with coworkers or public." [AR 90-91]

Based in part on this opinion, the ALJ determined, "the claimant is limited to unskilled, routine and repetitive jobs, with no public interaction, only occasional coworker interaction, and that do not involve tandem tasks." [AR 22]

Plaintiff contends that, in assigning great weight to Dr. Ryan's opinion, the ALJ was required to incorporate Dr. Ryan's stated limitations into her RFC but failed to do so. For instance, Plaintiff asserts the ALJ failed to incorporate Dr. Ryan's findings that Plaintiff could not work closely with supervisors and Plaintiff's interaction with coworkers must be less than "occasionally," and failed to account for Plaintiff's limitations in concentration, persistence and pace by simply finding him able to perform unskilled work.

First, Plaintiff is correct that the ALJ did not mention any limitations in Plaintiff's interaction with supervisors for the RFC; however, even if such omission were to be construed as error, the Court finds it harmless based on the vocational expert's testimony. Plaintiff contends that the ALJ's lack of reference to limited interaction with supervisors tainted the vocational expert's testimony concerning the jobs Plaintiff could perform. [Docket #14 at 33.] However, the expert, Ms. Hoiseth, testified that in all three cleaning jobs, an individual would be expected to learn his/her duties in about one month, and "when that is over there should not be any more supervisory intervention unless it's some change or something unusual comes up at the worksite." [AR 76] She also conceded that verbal altercations, depending on their degree, with supervisors and coworkers could result in termination. [AR 75] In any event, the Court finds Ms. Hoiseth's testimony concerning limited supervision to be consistent with Dr. Ryan's opinion that Plaintiff "cannot work closely with

15

supervisors or coworkers; can accept supervision if contact is not frequent or prolonged."

Second, Plaintiff argues the ALJ's allowance of *occasional* interaction with coworkers is improperly less restrictive than that limited by Dr. Ryan. Plaintiff interprets Dr. Ryan's statement that Plaintiff "can accept supervision if contact is not frequent or prolonged, less interaction with coworkers or public" as that Plaintiff must have less interaction with coworkers than with supervisors, the latter of which must be inferred as "occasional" since it is neither frequent nor prolonged. [Docket #14 at 32] Even if the Court were to accept Plaintiff's theory, the Court finds the ALJ's limitation of "occasional coworker interaction without tandem tasks" to be supported by substantial evidence in the record. Notably, Dr. Ryan produced her assessment on July 1, 2011 [AR 90]; the ALJ found that, since that time, Plaintiff had improved in his interaction with others, lived peaceably with a roommate, and held a job as an institutional cleaner for several months experiencing only "slight" verbal altercations with coworkers. [AR 27-28] These findings are accurately supported by evidence in the record.

Third, Plaintiff asserts that the ALJ's limitation to unskilled work did not properly account for Dr. Ryan's findings that Plaintiff was moderately limited in the ability to understand, remember and carry out detailed instructions or to maintain attention and concentration for extended periods. [AR 35-36] While Plaintiff is correct that "a cognitive or emotional impairment [is not] functionally equated with the lack of a skill" [docket #14 at 36], the Court notes that Plaintiff fails to consider the ALJ's *full* description of jobs he is able to perform ("unskilled, routine and repetitive jobs") and Dr. Ryan's findings that Plaintiff could "understand, remember and carry out very short and simple instructions," "perform activities within a schedule, maintain regular attendance, and be punctual

16

within customary tolerances," "sustain an ordinary routine without special supervision," "make simple work-related decisions," "ask simple questions or request assistance," and "maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness." [AR 90-91] Regarding the jobs description, the ALJ concluded, "[g]iven the claimant's longitudinal treatment history, his ability to earn a GED, and his ability to sustain concentration during the consultative psychiatric examination, the undersigned finds the claimant capable of sustaining unskilled work involving routine and repetitive tasks." [AR 27]

In his Reply brief, Plaintiff cites to *Jaramillo v. Colvin*, 576 F. App'x 870, 876 (10th Cir. 2014), which was issued after the ALJ's ruling and the Appeals Council's decision, for the proposition that an RFC assessment containing "unskilled, routine, repetitive work" does not itself incorporate moderate mental limitations in carrying out instructions, maintaining attention and concentration, and working without supervision.  Docket #16 at 10.  In *Jaramillo*, a psychiatrist, Dr. Mellon, whose opinion the ALJ accorded great weight, found the plaintiff to be "moderately limited in his ability to (1) carry out instructions, (2) attend and concentrate, and (3) work without supervision ... [but, he was] not limited in any of the other mental activities listed on the examination form: understand and remember very short and simple or detailed or complex instructions; interact with the public, coworkers, and supervisors; adapt to changes in the workplace; be aware of normal hazards and react appropriately; and use public transportation or travel to unfamiliar places." *Jaramillo*, 576 F. App'x at 876.  The Tenth Circuit found that "[n]one of the basic mental abilities of unskilled work described in SSR 85-15 captures any of the three *moderate* limitations Dr. Mellon found (carry out instructions, attend and concentrate, and work without supervision), nor do the

additional limitations to simple, routine, and repetitive tasks." *Id.* (emphasis in original). Under SSR 85-15, "[t]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." SSR 85-15, 1985 WL 56857, at *4 (1985).[2]  The *Jaramillo* court concluded that remand was necessary because:

> The limitation to simple, routine, repetitive, and unskilled tasks the ALJ included in his hypothetical to the VE did not clearly relate the moderate impairments Dr. Mellon found. Rather, the ALJ was required to express those impairments "in terms of work-related functions" or "[w]ork-related mental activities," SSR 96-8p, 1996 WL 374184, at *6. As a result, the ALJ's reliance on the jobs the VE identified in response to the hypothetical was not supported by substantial evidence.

*Jaramillo*, 576 F. App'x at 876.  The court did not further describe or explain the ALJ's questions or the VE's testimony during that hearing.

During the hearing in this case, the ALJ described the RFC to the vocational expert, then inquired as to the absentee rate and a need for the hypothetical employee to be "off task"; as to the latter, the expert opined that the cleaning jobs allowed for 15% of "off task time." [AR 72]  It does not appear that "off task" is a term described in SSA regulations; however, courts have in some respects equated the term "off task" with inabilities in concentration, persistence and pace.  *See e.g.*, *Israel v. Astrue*, 494 F. App'x 794, 797 (9th Cir. 2012) (citing *Stubbs-Danielson v. Astrue*, 539 F.3d

---

[2]A later ruling by the SSA, SSR 96-8p, 1996 WL 374184, at *6 (July 2, 1996), which is cited in *Jaramillo* provides: "Work-related mental activities generally required by competitive, remunerative work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting."

1169, 1174 (9th Cir. 2008)); *see also Miller v. Astrue*, No. 05:07CV131 (STAMP), 2009 WL 530351, at *22-23 (N.D. W.Va. Mar. 2, 2009) (citing VE's testimony quantifying "off task" when the hypothetical individual has concentration and memory difficulties); *but see Stephens v. Colvin*, No. 14-cv-02484-YGR, 2015 WL 3430586, at *6 (N.D. Cal. May 28, 2015) ("...being 'off task' and an inability to maintain 'concentration, persistence or pace' are not the same thing. A person could be focused on the task at hand for an entire hour, for example, and complete only 85% of a project due to reduced pace; this does necessarily mean that the person was 'off task' for 15% of the time."). Nevertheless, neither the expert nor the ALJ in this case defined or described the 15% "off task" limitation, nor did the ALJ include it in the RFC. *See, e.g., Rapp v. Colvin*, No. 12-cv-353-wmc, 2015 WL 1268327, at *6 (W.D. Wis. Mar. 19, 2015) (citing SSR 96-8p, court remanded ALJ's decision for failure to explain 10% "off task" limitation). Consequently, the Court cannot discern whether the "off task" limitation identified by the expert here relates to or incorporates the moderate limitations found by Dr. Ryan.

Because this case is similar to *Jaramillo* in important respects (the ALJ accorded great weight to Dr. Ryan's opinion and Dr. Ryan found Plaintiff had moderate limitations in carrying out detailed instructions and maintaining attention and concentration for extended periods, but could "understand, remember and carry out very short and simple instructions," "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances," "sustain an ordinary routine without special supervision," and "make simple work-related decisions"), the Court finds it necessary to remand the decision to the Appeals Council for further consideration in light of *Jaramillo*.

**IV.      Whether the ALJ Erred by Basing Some Mental Limitations on "Unweighed" Evidence**

Plaintiff argues that the ALJ's "reliance" on Nurse Sandoval's opinion is improper because she failed to assign the opinion any weight before concluding: "Given the clinical findings and observations during [Nurse Sandoval's] examination, the undersigned finds the claimant capable of unskilled work." Docket #14 at 38-39 (citing to [AR 26]).

First, like the Plaintiff, the ALJ acknowledged that Nurse Sandoval is not an "acceptable medical source" as defined in the regulations and, thus, the ALJ implied the nurse's diagnoses would not be given controlling weight. [AR 26]; *see also* SSR 06-3p (Aug. 9, 2006), 2006 WL 2329939, at *2 (only "acceptable medical sources" can be considered treating sources, whose medical opinions may be entitled to controlling weight).

Second, the Court rejects the Plaintiff's argument that the ALJ relied "solely" on Nurse Sandoval's evaluation for her finding that Plaintiff was capable of unskilled work. "Unskilled occupations are the least complex types of work. Jobs are unskilled when persons can usually learn to do them in 30 days or less." SSR 82-41, 1982 WL 31389, at *2 (1982). The ALJ, in addition to the finding quoted above, concluded, "The undersigned has considered the evidence of record and finds the claimant limited to but capable of unskilled, routine, repetitive work activity that involves limited interaction with others, despite his mental health impairments." [AR 26] She goes on to explain this conclusion based on the record:

> The claimant was able to enroll in school and earn his GED after his alleged onset date, which supports a determination that the claimant is capable of sustaining unskilled work activity. In addition, the medical evidence of record does not include significant concern regarding the claimant's memory, attention, and concentration. He reported minimal symptoms and no more than mild symptoms were noted in a

brief psychiatric rating assessment shortly after his alleged onset date (Exhibit IF, page 4).  During a mental status examination after his release from prison in early 2011, the claimant had normal memory, concentration, and orientation (Exhibit 2F, page 5). He has logical, linear, and goal directed thought processes, with clear, coherent, spontaneous, and not pressured speech, despite his mental health impairments and reported symptoms of anger, irritation, and anxiety (Exhibit 1OF, page 7). During a consultative psychological examination, the claimant had intact concentration to complete tasks, organized thought process, and good immediate recall (Exhibit SF). Although he did not remember any of the three objects given to him five minutes earlier, he correctly subtracted serial sevens from one hundred through five calculations, demonstrating an ability to sustain concentration (Id.). Given the claimant's longitudinal treatment history, his ability to earn a GED, and his ability to sustain concentration during the consultative psychiatric examination, the undersigned finds the claimant capable of sustaining unskilled work involving routine and repetitive tasks.

[AR 27] As to the fact that the ALJ did not identify a particular weight given to Nurse Sandoval's evaluation, the Court finds instructive a decision by Senior Judge Lewis T. Babcock of this Court in *Chavez v. Astrue*, No. 12-cv-00627-LTB, 2012 WL 5250396 (D. Colo. Oct. 24, 2012), in which Judge Babcock reversed the opinion of an ALJ who failed both to identify a particular weight given to a treating source and to explain any reasons for whatever weight was accorded.  *Id.* at *7.  Judge Babcock concluded the ALJ's "blanket, conclusory statements summarily adopting [the medical expert's] opinions wholesale is not 'sufficiently specific to make clear to [me] the weight [he] gave to [the treating physician's] opinion and the reasons for that weight.'" *Id.*  From Judge Babcock's decision, this Court infers that an omission of a stated particular weight may be harmless if the ALJ provides specific reasons for his or her treatment of the medical opinion.  *See Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) ("an ALJ must give good reasons ... for the weight assigned to a treating physician's opinion," that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason

for that weight.").

Here, it is clear that the ALJ gave at least some weight to Nurse Sandoval's evaluation, as, after a thorough description of the evaluation, she determined Plaintiff to be capable of unskilled work, but unable to perform tandem tasks and have interaction with the public, based on Nurse Sandoval's clinical findings and observations. [AR 26] However, the ALJ also rejected[3] Nurse Sandoval's diagnosis of post-traumatic stress disorder saying, "The medical evidence of record does not include a diagnosis of post-traumatic stress disorder from an acceptable medical source." [*Id.*] These reasons are specific and sufficient for meaningful review of the ALJ's opinion concerning Nurse Sandoval.

Finally, Plaintiff's argument that "the ALJ did not even attempt to draw any inferences of plaintiff's limitations from the psychiatric evaluation performed by the [ADMHN]" is incorrect. The ALJ described in detail the Plaintiff's reports and treatment/goals, as well as the ADMHN's findings and observations, from March-August 2011 in her decision. [AR 24-25] At the conclusion of this description, the ALJ stated, "He had made modest progress in his treatment goals and had earned his GED." [AR 25] The ALJ used this information to determine Plaintiff's ability to perform unskilled, repetitive, routine work. [*See* AR 27] Moreover, the ALJ's failure to mention the GAF score of 41 was not error; the score was assessed at ADMHN as of his discharge date of October 17,

---

[3]Although the ALJ effectively rejected this diagnosis, she noted "that the residual functional capacity assessment determined in this decision accommodates all of the claimant's symptoms and limitations from any mental health impairment to the extent the substantial evidence of record supports his alleged symptoms and limitations." [AR 26]

2011, but there is no finding at that time that the Plaintiff could not work.[4] [*See* AR 480-482] Thus, the ALJ was not required to consider the GAF score at ADMHN.  *See Zachary v. Barnhart*, 94 F. App'x 817, 819 (10th Cir. 2004) (unpublished) (an ALJ is not required to discuss GAF score where the examining physician did not state the claimant could not work, and the ALJ summarized the examining physician's report and gave no indication that he was rejecting the opinion); *see also Lopez v. Barnhart*, 78 F. App'x 675, 678 (10th Cir. 2003) (unpublished) (holding that, where the examining physician did not indicate that claimant could not work, the ALJ did not err by failing to discuss a GAF score of 40 because a GAF score, standing alone, "does not evidence an impairment seriously interfering with [a] claimant's ability to work").

In sum, the Court finds the ALJ based the mental limitations in her RFC on properly evaluated, substantial evidence.

V.      **Whether the ALJ Properly Evaluated Nurse Jackson's Opinion re: Mental Limitations**

The Plaintiff contends that the ALJ improperly omitted from consideration of her own RFC several specific limitations from Nurse Jackson's RFC finding: an impaired ability to maintain attention and concentration for extended periods; an impaired ability to complete a normal workweek without interruptions; and an impaired ability to perform at a consistent pace without unreasonable rest breaks.  Docket #14 at 45.  Moreover, Plaintiff argues that the ALJ's stated reasons do not warrant discounting Nurse Jackson's opinion to the extent that her opinion would be

---

[4]The Court acknowledges that Nurse Jackson at the ADMHN completed a form for Plaintiff's attorney six months earlier in which she noted a GAF score of 41 in relation to questions regarding the Plaintiff's ability to work.  [AR 459-462] There is no indication in the record, however, that Nurse Jackson intended the GAF score on October 17, 2011 to relate to Plaintiff's ability to work.

outweighed by the nonexamining physician's opinion.  *Id.* at 46.

First, the Court notes that Plaintiff's attempt to liken his limitations to those considered in *Chapo v. Astrue*, 682 F.3d 1285, 1289-90 (10th Cir. 2012) is not persuasive.  Unlike the Plaintiff here, Chapo was diagnosed with "marked to extreme" limitations of certain abilities, while Plaintiff refers only to moderate limitations on certain abilities.  *See* docket #14 at 45.

Second, the Court finds the ALJ proffered good reasons for discounting Nurse Jackson's opinion.  In finding Nurse Jackson not to be an "acceptable medical source," the ALJ simply determined she could not accord the opinion controlling weight; she did not discount or reject the opinion outright solely for this reason. [AR 29]  Next, it is not improper to discount an opinion because it was prepared at Plaintiff's counsel's request if the opinion is not effectively rejected and counsel's request for the opinion is not the sole reason justifying the discount.  *Quintero v. Colvin*, 567 F. App'x 616, 620 & n.6 (10th Cir. 2014).  Here, the ALJ neither rejected nor assigned "little, if any" weight to Nurse Jackson's opinion, and she provided several reasons for discounting the opinion. [AR 29] Moreover, the ALJ's finding that Plaintiff did not have a lengthy treating relationship with Nurse Jackson is not only proper, but required as one of the factors to consider in weighing a medical source opinion.  *See* 20 C.F.R. § 404.1527(d) (listing factors to be considered when "deciding the weight [to be given] to any medical opinion"); *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2001) (stating sufficient reasons to disregard physician's opinion included lack of support for findings, opinion was inconsistent with other medical opinions, and treatment relationship with claimant was relatively brief).  Plaintiff contends the ALJ's finding is inconsistent with the weight given to the reviewing examiner who never saw the Plaintiff and bases this

24

argument on Plaintiff's proposition that "an ALJ cannot discount a physician's opinion for containing the same defect contained in the opinion which the ALJ accepted." Docket #14 at 49. However, the case cited by the Plaintiff for his proposition, *Teter v. Heckler*, 775 F.2d 1104 (10th Cir. 1985), found that an ALJ cannot summarily reject medical opinions based on inadequate findings when those opinions are comparable to other medical reports the ALJ found to be sufficiently detailed. *Id.* at 1106. Here, the ALJ did not reject Nurse Jackson's opinion and she proffered other reasons for discounting the opinion.

The ALJ's stated "primary" reason for discounting the opinion was that it was not supported by substantial evidence in the record. Specifically, she found:

> The form indicates that the claimant would be unable to meet competitive standards of employment in the areas of interacting appropriately with the general public, accepting instruction and responding appropriately to criticism from supervisors, and getting along with coworkers or peers without distracting them or exhibiting behavioral extremes (Exhibit 3F, page 2). In addition, the form reflects that he has serious limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with and proximity with others without being distracted by them, complete a normal workday/workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Id.). The undersigned finds evidence of record supports some limitation in these area, in particular the undersigned finds the claimant's symptoms likely prevent him from sustaining complex work tasks; however, the evidence does not support a finding that the claimant would be unable to meet competitive standards in his social interactions. As discussed previously, the record reflects concerns related to the claimant's social functioning and that the claimant is irritable, angry, and moody. However, he was able to complete probation, lives with a roommate, and was successfully controlling his anger outbursts according to his treatment notes. Therefore, the undersigned finds the claimant capable of occasionally interacting with his coworkers so long as he is not required to engage in tandem tasks. Consistent with the limitations identified in this decision's residual functional capacity assessment, the form indicates the claimant has a satisfactory to unlimited ability to remember, understand, and carry out simple instructions and make simple work-related decisions (Id.)

There is no evidence of record to support Ms. Jackson's assessment that the claimant would miss more than three days of work per month. Therefore, the undersigned declines to assign controlling weight to this opinion and instead assigns the opinion weight to the extent evidence of record supports the opined limits.

[AR 29] The Court finds the ALJ provided good reasons for discounting Nurse Jackson's opinion based on the evidence in the record.

However, the Court finds that one reason provided by the ALJ is inaccurate; the ALJ inferred from the treatment notes that Nurse Jackson and the Plaintiff completed the form together, which might imply the nurse's opinion was based on subjective reports rather than an objective assessment. [AR 29] After reviewing the record, the Court finds that the treatment note from April 4, 2011 is titled "Chart Documentation Note" and reflects Nurse Jackson's notation, "Completed Medical Source Statement per request of p[atien]t and attorney." [AR 507] There is no indication from this note that Plaintiff was present; in fact, the notes reflect that Nurse Jackson met with Plaintiff on March 30, 2011 [AR 507-508] and April 12, 2011 [AR 504-505]. Although the ALJ inaccurately interpreted the record in this manner, the Court finds it does not warrant reversal. In other words, the factual inaccuracy does not otherwise undermine the existence in the record of "such relevant evidence as a reasonable mind might accept as adequate to support [the ALJ's] conclusion" (*see Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007)), that Plaintiff retained the RFC to perform "unskilled, routine and repetitive jobs, with no public interaction, only occasional coworker interaction, and that do not involve tandem tasks." [AR 22] Furthermore, nothing in the record raises an issue whether the ALJ complied with her "basic duty of inquiry to fully and fairly develop the record as to material issues." *Baca v. Dep't of Health & Human Servs.*, 5 F.3d 476, 479-80 (10th

Cir. 1993).

Plaintiff argues that the "ALJ simply did not explain why she omitted several of Ms. Jackson's specific limitations from her RFC finding."  Reply, docket #16 at 22.  The Court disagrees. As set forth above, after listing the limitations found by Nurse Jackson, the ALJ stated,

> The undersigned finds evidence of record supports some limitation in these areas, in particular the undersigned finds the claimant's symptoms likely prevent him from sustaining complex work tasks; however, the evidence does not support a finding that the claimant would be unable to meet competitive standards in his social interactions. As discussed previously, the record reflects concerns related to the claimant's social functioning and that the claimant is irritable, angry, and moody.  However, he was able to complete probation, lives with a roommate, and was successfully controlling his anger outbursts according to his treatment notes.  Therefore, the undersigned finds the claimant capable of occasionally interacting with his coworkers so long as he is not required to engage in tandem tasks.  Consistent with the limitations identified in this decision's residual functional capacity assessment, the form indicates the claimant has a satisfactory to unlimited ability to remember, understand, and carry out simple instructions and make simple work-related decisions. (Id.)

[AR 29]  The Court finds that the ALJ provides specific, legitimate reasons for omitting from the RFC the moderate limitations in certain areas set forth in Nurse Jackson's April 2, 2011 opinion.

## CONCLUSION

In sum, the Court concludes that the ALJ properly weighed Dr. Warfield's, Dr. Ryan's, and Nurse Sandoval's opinions and properly evaluated Nurse Jackson's opinion regarding mental limitations.  However, in light of the Tenth Circuit's recent opinion in *Jaramillo v. Colvin*, 576 F. App'x 870, 876 (10th Cir. 2014), the Court finds it necessary to remand the Commissioner's decision for consideration of whether the RFC assessment properly incorporates Dr. Ryan's moderate limitations of certain of Plaintiff's mental capabilities.

Therefore, the decision of the ALJ that Plaintiff Michael Mast was not disabled is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED** to the Commissioner for

further consideration in accordance with this order.

Dated at Denver, Colorado this 15th day of July, 2015.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge